**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIA LOUISE FRATANTION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 16 C 2009** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **NANCY A. BERRYHILL, Acting** | ) | **Michael T. Mason** |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Maria Fratantion ("Claimant") brings this motion to reverse the final decision of the Commissioner of Social Security ("Commissioner"), denying Claimant's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under 42 U.S.C. §§ 416(i) and 423(d) of the Social Security Act ("the Act"). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, Claimant's motion for summary judgment is granted [30], and the matter is remanded for further proceedings.

**BACKGROUND**

---

[1] Nancy A. Berryhill succeeded Carolyn Colvin as the Acting Commissioner of Social Security on January 23, 2017 and is substituted as the named defendant pursuant to Federal Rule of Civil Procedure 25(d).

## I.    PROCEDURAL HISTORY

This is the second time Claimant's application for benefits has come before the District Court.  Claimant originally applied for benefits on September 3, 2009, alleging disability since April 1, 2007 due to back pain with leg pain and numbness.  (R. 142, 177.)  Her claim was denied initially on December 1, 2009, and upon reconsideration on April 13, 2010.  (R. 15, 81-82.)  On May 10, 2010, Claimant requested a hearing before an administrative law judge ("ALJ").  (R. 96.)  An administrative hearing was held on November 17, 2010.  (R. 33-79.)  Claimant, who was represented by counsel, appeared and testified.  (*Id.*)  A vocational expert ("VE") also appeared and testified.  (*Id.*)  On January 6, 2011, the ALJ issued a written decision denying Claimant's application for DIB and SSI benefits.  (R. 15-29.)  The Appeals Counsel denied review on November 27, 2012, leaving the ALJ's decision as the final decision of the Commissioner.  (R. 1-6); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998); 20 C.F.R. § 416.1481.  On August 5, 2014, the U.S. District Court for the Northern District of Illinois granted Claimant's motion for summary judgment and remanded the action for further proceedings.  (R. 551-97.)

A new ALJ conducted a second hearing on March 26, 2015.  (R. 506.)  On July 8, 2015, the ALJ denied Claimant's claim, again finding that she was not disabled as defined by the Act during the relevant period of April 1, 2007 through March 31, 2010.  (R. 483–504.)  Plaintiff appealed that decision to the Appeals Council, which granted a review of her claim.  (R. 460-66.)  After a review of the record, the Appeals Council concluded that the ALJ's decision complied with the District Court's order and was supported by substantial evidence, and thus affirmed the ALJ's denial of Claimant's

claim on December 14, 2015.  (R. 460–464.)  The ALJ's opinion became the final

decision of the Commissioner.  20 C.F.R. § 416.1481; *Estok*, 152 F.3d at 637.  Claimant

subsequently filed this action in the District Court.

## II.    MEDICAL EVIDENCE

### A.    Treatment Records

The medical record begins on October 16, 2008, when Claimant presented to the

emergency room at Edward Hospital with pain in her left hip, which radiated from her

lower back down her left leg, and started four days prior.  (R. 285.)  There was no

numbness or weakness in the leg.  (*Id.*)  Claimant reported that she had problems with

her left leg over the course of the years, but had only been diagnosed with bursitis and

undergone steroid injections.  (*Id.*)  The examining physician noted paraspinal

tenderness and a positive straight leg test at 30 degrees on the left side, negative on

the right side.  (*Id.*)  While X-rays showed no obvious fractures or degenerative changes

in her hip, they revealed significant degenerative changes in her lower back.  (*Id.*)  After

being treated with pain medication, Claimant was comfortable and was discharged to

home.  (R. 286.)

On November 5, 2008, Claimant met with Dr. Michael Rabin, a neurosurgeon,

about her back pain.  (R. 333.)  Dr. Rabin documented that Claimant began having

lower back pain that radiated down her left leg three-to-four years ago.  (*Id.*)  After an

examination and a review of her recent MRI scans, Dr. Rabin concluded that she had

mild to moderate spinal stenosis and would likely benefit from a decompressive lumbar

laminectomy, a surgery to reduce pressure on the spinal nerve roots.  (*Id.*)  Dr. Rabin

performed the lumbar laminectomy on November 25, 2008.  (R. 287.)  The findings from

the procedure were a tighter stenosis than originally anticipated and thickened ligament at L4-5.  (R. 287.)  During a rehab medicine consultation, Claimant was found to have impaired mobility and self-care impairments that were recommended to be treated at an acute rehab setting for intensive therapies.  (R. 290.)  According to the physician, the acute rehab treatment could last up to a week and a half, although Claimant expressed her preference to go home.  (R. 291.)  She was discharged in stable condition on November 30, 2008.  (R. 306.)

Claimant later developed a deep post-operative infection and, on December 7, 2008, was readmitted to Edward Hospital with a high fever and pain and discharge at the wound site.  (R. 292, 295–97, 309.)  On December 10, 2008, surgeons re-opened her surgical wound and found gross infection with necrotic debris above the fascial layer.  (R. 304.)  The infection was treated and a drain was installed.  (*Id.*) The drain was later removed, and she was discharged from the hospital on December 16, 2008. (R. 309.)

Claimant was referred to Dr. Yousuf Sayeed at DuPage Valley Pain Specialists. (R. 336-37.)  On December 31, 2008, Claimant complained of lower back pain, primarily at the incision site, as well as numbness down both legs.  (R. 336.)  However, Dr. Sayeed noted that her worst symptoms were in the low-back region, which was not in pain prior to surgery.  (R. 336-37.)  They discussed pain medication options.  (*Id.*)

Claimant had follow-up appointments with Dr. Rabin in early 2009.  (R. 322-331.) He documented on January 30, 2009, that she was doing remarkably well.  (R. 327.)  At a wound care follow-up appointment on February 3, 2009, Claimant still had some drainage and chronic discomfort at the surgical site, but her infection appeared to be

resolved. (R. 307.) The surgical site was considered "completely healed" at her next appointment two weeks later. (R. 310.)

On February 27, 2009, Dr. Rabin recommended physical therapy to help with Claimant's leg and lower back pain, which he suspected to be secondary to the irritation from the infection that was still resolving. (R. 324.) An April 14, 2009, MRI revealed no evidence of scoliosis or spondylolisthesis. (R. 334.) On April 17, 2007, Dr. Rabin documented that Claimant was making progress, had improvement in her lower back pain, and was being weaned gradually from OxyContin. (R. 323.)

Claimant received ongoing pain management care with medications from Dr. John Mikuzis at Action Physical Medicine and Rehabilitation[2], regularly from May through October 2009. (R. 360-80.) At the initial appointment, Claimant's chief complaint was chronic pain that worsened with movement, activity, bending, coughing, and weather. (R. 377.) The treatment notes regularly documented trouble walking, muscle weakness, joint pain, and fatigue. (R. 360, 362, 364, 366, 368, 370, 373, 375.) Claimant's pain ranged from a five-to-ten out of ten, but was usually an eight out of ten. (*Id.*) In June 2009 Claimant slipped at the grocery store and experienced an acute worsening of her pain. (R. 440.)

From July through September 2009, Claimant also completed a course of physical therapy. (R. 383–385.) At her initial physical therapy evaluation on July 23, 2009, Claimant reported that she was improving until her fall in June 2009, which brought her "back to square one." (R. 384.) According to Claimant, the pain was constant, the intensity varied, and she was only able to do household chores with the help of medications. (*Id.*) The physical therapy resulted in some improvements in

---

[2] The treatment notes are handwritten and often difficult to interpret.

flexibility, trunk stabilization, and range of motion but no overall improvement in her pain symptoms. (R. 383.)

In September 2009, Claimant complained of discomfort and achiness in her lower back and legs, but indicated that her medications were controlling her pain. (R. 362, 364.) She still had some trouble walking. (R. 362.) In October 2009, Dr. Mikuzis noted that, though Claimant's pain medications helped, she complained of worsening pain and had some difficulty walking. (R. 360.) She found some relief from heat and from sitting in a recliner. (*Id.*)

On December 17, 2009, Claimant again reported to the emergency room at Edward Hospital and was hospitalized with intractable low back pain that was made worse by coughing. (R. 438.) She also had pain in both hips, primarily the left, which radiated to her legs and caused numbness in her calves and feet. (*Id.*) An MRI did not show any evidence of recurrent infection or lumbar disc disease. (R. 445.) Dr. Rabin examined her and requested a consultation from orthopedic specialist, Dr. David Mochel, to rule out any independent hip issue. (R. 440–442.) Dr. Mochel opined that Claimant's hip pain was likely from her lumbar spine. (R. 442.) She was given a fentanyl patch for additional pain control and was discharged from the hospital on December 23, 2009. (R. 445.)

On January 26, 2010, Claimant went to see Dr. Michael Shaefer, regarding the pain in her lower back that radiated down her legs. (R. 400.) Dr. Shaefer noted that she was on a number of medications that did not relieve her pain. (*Id.*) He ordered an updated MRI with contrast. (R. 400, 404–05.) After reviewing the MRI films, on March 3, 2010, Dr. Schafer told her that her primary problem was instability at L4 and L5 and

that she was a candidate for spinal fusion surgery.  (R. 398.)  He cautioned, however, that she was at high risk of infection from surgery since she had already suffered one post-operative infection.  (R. 398–99.)  Before he would consider surgery, Dr. Schafer stated that Claimant would need to stop smoking for at least two months and then be seen by the high risk team.  (*Id.*)

In February, March, and April 2010, Claimant visited the Pain Centers of Chicago in Joliet, Illinois for medications to manage the pain in her lower back and both feet.  (R. 411, 413, 415.)  During her March and April visits, her pain score was a ten out of ten, with a recent "best" pain score of five or six.  (R. 411, 413.)  She was walking without assistance.  (*Id.*)  A Duragestic patch helped to control her pain better.  (R. 411.)

On November 16, 2010, Claimant went to visit her primary care physician Dr. Robert D. Rozner and requested a letter for her disability claim.  (R. 456.)  Though the notes reveal no musculoskeletal exam that day, Dr. Rozner did note that Claimant was "Doing HORRIBLY" with "unrelenting" pain in her back and now in her hands, and some numbness in her heels.  (R. 456-57.)  Claimant reported that she could not lift half a gallon of milk, needed to use a cane to move around the house, and could do light activities for no more than twenty minutes at a time.  (R. 456.)

The file contains no records from 2011.  Treatment records resume in November 2012, after the close of the period relevant for this claim.  The records indicate that Claimant received pain management care, including prescriptions, from the Pain Centers of Chicago approximately monthly up through the time of her March 2015 hearing.  (R. 789–846.)  In August 2014 and again in December 2014 she expressed hope that a new orthopedic surgeon, Dr. Cary Templin, could treat her pain with a

surgical procedure less "invasive" than spinal fusion.  (R. 805, 815.)  She had lumbar facet injections in September 2014 and radiofrequency ablation in December 2014, both of which provided only temporary relief.  (R. 808–14.)

In February 2015, a month before Claimant's second hearing, and more than four years after the close of the period relevant to this review, she underwent spinal fusion surgery with Dr. Templin.  (R. 767–69.)

### B.    Medical Opinion Evidence

On November 20, 2009, reviewing medical consultant Dr. Richard Bilinsky, reviewed Claimant's file and opined that she could lift up to ten pounds frequently or occasionally; could stand or walk for at least two hours in an eight-hour workday; and could sit for about six hours in an eight-hour workday.  (R. 387, 393.)  Dr. Bilinsky also opined that Claimant could frequently climb ramps; could occasionally climb stairs, stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to hazards.  (R. 389–90.)  On April 12, 2010, another state medical consultant, Dr. George Andrews, reviewed Claimant's file, including additional medical records from Dr. Shaefer, and affirmed the prior consultant's residual functional capacity ("RFC") finding.  (R. 452–54.)

### C.    Claimant's Testimony

At her first hearing on November 17, 2010, Claimant was 47 years old and had attended college for two years.  (R. 39.)  She testified that she had last worked in a high school cafeteria from 2004 to 2007, preparing and serving meals.  (R. 39–40, 51–54.)  During that time, she stood and lifted pans that were forty-to-fifty pounds.  (R. 52.)

Claimant testified that she saw her doctor, Dr. Rosner, every three months or so and went to the pain clinic every two months.  (R. 40.)  She explained that she had

trouble walking because of pain in her hips and back, and numbness in her legs. (R. 41, 45.) According to Claimant, she never had back pain before, it was always hip pain, but she woke up one morning to increased pain and knew that something was not right. (R. 41-42.)

She had a laminectomy and is supposed to have a fusion, but she needs to quit smoking first. (R. 42.) She is doing well quitting smoking, but is also afraid to have the surgery. (*Id.*) She testified that her pain never goes away, and that it is worsened by being on her feet too much and by attempting various activities, such as getting clothes out of the dryer. (R. 43). The pain extends from her back down her legs, and causes numbness in her feet. (*Id.*) Claimant testified that she has no feeling in her heels or in the back of her right leg since the first surgery. (R. 61.)

Claimant testified that she tries to do certain chores, but it is very difficult. (R. 43.) She goes to the store for milk and bread, but needs to use two hands on the cart. (R. 43-44.) She tries to take care of the house, but needs to rest frequently. (R. 44.) Claimant explained that she can sit comfortably for fifteen-to-twenty minutes before needing to stand. (*Id.*) She has used a cane from Walgreens in the mornings since her surgery, and has been using the cane for all walking for the past month. (R. 45.) She can stand for about five minutes before needing to rest. (*Id.*) Her hands, especially the right one, have been going numb over the past two-to-three months. (R. 45-46.) She can only do things with her hands for twenty minutes before needing to stop. (R. 46.) She cannot lift more than a gallon of milk with her two hands, and she can generally independently perform personal hygiene, although her daughters help her dry her hair. (*Id.*) She testified that she used to cook very elaborate meals, but she now can only

9

cook basic meals, such as frozen food.  (R. 46-47.)  She will work all day on something if she wants to make something more elaborate, like tomato sauce.  (R. 47.)  She used to do a lot of crafts, but can no longer do them.  (R. 48.)  She pays bills on the computer, but is not very good at it otherwise.  (*Id.*)  As far as household chores, she will dust and put items in the dishwasher.  (R. 49.)  She can no longer go to church because it is too hard to sit in the pews.  (R. 49-50.)  She explained that her two daughters help her "all the time" at home.  (R. 57.)

She is not able to sleep well, and can only sleep in a recliner now.  (R. 54.)  She explained that four hours of sleep is a good night, and she usually has to nap once or twice a day.  (*Id.*)  Claimant also testified that their home was foreclosed on because she could not work and her husband lost his construction job due to the economy.  (R. 50.)

One of her medications makes her very drowsy, but she continues to take it three times a day when she knows she will be stationary because it helps with spasms and numbness.  (R. 41.)  The pain medicine only provides a little relief.  (R. 51.)  She had undergone physical therapy with little improvement, often feeling worse the next day. (R. 43.)  Claimant explained that she is on Lexapro for depression, but that Dr. Rosner does not think she needs to see a counselor at this point because she should feel better once her physical symptoms have improved.  (R. 62-63.)

Claimant further testified that she was told that she would feel far worse during recovery from the spinal fusion than she had after her prior surgery.  (R. 42, 59.)  She explained that her surgeon had told her that scar tissue from her prior surgery and staph infection would require them to choose a different incision site, and that she had a "60 to

80 percent chance" of another infection after the surgery. (R. 61.) Further, according to Claimant, while the surgery should make her less dependent on certain medication, her doctor told her that it will not completely resolve the problem. (R. 62.)

Claimant's daughter also testified that she helps her mother with a lot of day-to-day activities like laundry, dinner, and going to the store. (R. 65.) Her daughter stated that her mother walks slow and cannot sit for a long time. (R. 66-67.)

Pursuant to the District Court's remand, Claimant had a second hearing on March 26, 2015. (R. 506.) She continued to see doctors regularly, including a pain clinic every few months. (R. 516.) She had undergone a third back surgery the previous month, a spinal fusion with hardware. (R. 519.) Between her 2008 laminectomies and the 2015 surgery, Claimant had a facet injection as well as a radio frequency ablation. (R. 519.) She went through physical therapy and had a TENS unit, which caused her pain to be about the same. (R. 519-20.) Claimant again addressed her previous work history, the chores she tried to do around the house, and her sleeping habits, all of which remained unchanged since her original testimony. (R. 514-16, 522-23.)

She testified that during the relevant period she had constant pain in her back and legs, along with spasms. (R. 521–22.) During the relevant time period she could also only sit for an hour at the most and stand in one place for ten minutes. (R. 525.) The pain eased up when she sat down, but it never stopped. (R. 522.) Moving and trying to do things around the house made it worse. (*Id.*) She could walk perhaps a quarter of a block and back and used a cane to get up and moving in the mornings, but she did not then use the cane much during the day. (R. 520-21, 525.) Claimant

testified that she cannot go to family parties, babysit her grandson, and generally stays home.  (R. 527-28.)  Her pain sometimes caused her to lose focus on what people were saying.  (R. 529.)

### D. Vocational Expert Testimony

A vocational expert (the "VE") also testified at the March 2015 hearing.  He described Claimant's past work as a cook as a medium-exertion, skilled job, with skills that would transfer to a light-exertion cook job but not to any sedentary job.  (R. 531–32.)  The ALJ asked the VE to consider a hypothetical individual of Claimant's age, experience, and education who was limited to sedentary work; who could never climb ladders, ropes, or scaffolding; who could occasionally climb ramps and stairs; who could occasionally balance, stoop, kneel, crouch, and crawl; and who needed to avoid concentrated exposure to hazards.  (R. 532.)  The VE testified that such a person could not perform Claimant's past work but could perform jobs available in the state of Illinois, including final assembler in the industry of optical goods (1,000 jobs in Illinois); weight tester in the paper and pulp industry (1,400 jobs in Illinois); and food and beverage order clerk [3].  (R. 532–33.)  Such a person, however, would not be employable if she needed to be off task for approximately twelve minutes every hour to shift position, get up, move, or stretch.  (R. 533–34.)  If the person needed to shift positions every ten minutes, she could not perform a production job.  (R. 534-35.)  An order clerk could sit or stand at will, but a need to shift positions as often as every ten minutes might indicate a loss of focus that would make the person unemployable.  (R. 535.)

When questioned by Claimant's lawyer as to how he had arrived at the employment numbers he gave, the VE explained that he had considered the total

---

[3]  The number of positions in Illinois was not provided.

number of available jobs in the broad occupational categories he considered—
assembler, inspector/checker/weigher, and order clerk—and reduced them to consider
only jobs that could be performed by someone working at the sedentary level.  (R. 533.)
The VE opined that 95% of the assembler and 95% of the inspector/checker/weigher
jobs would be eliminated, as would 80% of the order clerk jobs.  (R. 533, 537–41.)  The
VE drew the overall job numbers from the annual wage and employment surveys
generated by the Bureau of Labor Statistics, and relied on his professional experience
in estimating the 95% and 80% reductions in job numbers.  (R. 537–41.)

### E.  Prior District Court Remand Order

On August 5, 2014, Magistrate Judge Cole remanded Claimant's case to the
Commissioner for further proceedings.  (R. 552.)  Specifically, Judge Cole found that
the ALJ failed to explain how her conclusion was supported by objective medical
evidence.  (R. 575.)  Further, Judge Cole held that the ALJ improperly discredited
Claimant's alleged symptoms.  (*Id.*)  Judge Cole did, however, find that the ALJ did not
need to recognize "failed back surgery syndrome" as an additional impairment; properly
weighed the medical evidence; properly considered Claimant's pain limitations;
committed harmless error in not discussing Claimant's obesity; and properly met the
burden at step five.  (R. 579, 581, 586.)

### DISCUSSION

## I.    ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations (collectively, the "Listings")? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step three, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one through four. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

Here, the ALJ found at step one that Claimant did not engage in substantial gainful activity during the period at issue in this appeal, which began on Claimant's alleged onset date of April 1, 2007 and ended on the date she last met the insured status requirements of the Act, which was March 31, 2010. (R. 485.) At step two, the ALJ concluded that Claimant had the severe impairments of degenerative disc disease of the lumbar spine, status post-surgery; obesity; and hypertension. (R. 486.) The ALJ found at step three that her impairments, alone or in combination, did not meet or medically equal a Listing. (*Id.*) The ALJ then determined that Claimant retained the

RFC to perform sedentary work, except that she could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could occasionally balance, stoop, kneel, crouch, and crawl; and needed to avoid concentrated exposures to hazards such as moving machinery and unprotected heights.  (R. 487.)  Based on her age, education, work experience, and RFC, the ALJ determined that, during the relevant period, there were jobs available in the economy that Claimant could perform.  (R. 498.)  Accordingly, the ALJ found that she was not disabled as defined by the Act.  (*Id.*)

## II.   JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, or resolving conflicts in evidence.  *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "reasonable minds could differ" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind

her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, he must "build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . ."); *see also Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III.  ANALYSIS

Claimant contends that three errors in the Administration's decision mandate remand: (1) the ALJ's credibility determination was patently wrong; (2) the ALJ failed to support his assessment of Claimant's RFC; and (3) the ALJ based his step five analysis on flawed vocational expert testimony.

### A.  Subjective Symptom Evaluation

At the core of Claimant's claim is her criticism of the ALJ for discrediting her testimony regarding the limitations caused by her impairments. As an initial matter, the Court notes that the Social Security Administration has recently updated its guidance about evaluating symptom severity in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the SSA's sub-regulatory policies to "more closely follow [the] regulatory language regarding symptom evaluation" and to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1; *Cole v. Colvin,* 831 F.3d 411, 412 (7th Cir. 2016) ("The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character.") Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where, as here, the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482–83 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999); *see also Hernandez v. Colvin,* 2016 WL 4681227, at *7 (N.D. Ill. Sept. 7, 2016). Therefore, it is appropriate to evaluate Claimant's descriptions of her subjective symptoms pursuant to both existing case law and the guidance the Administration has provided in SSR 16-3p.

As before, under SSR 16-3p the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 WL 1119029 at *2. The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-

disability while ignoring evidence that points to a disability finding. *Goble v. Astrue,* 385 Fed. Appx. 588, 593 (7th Cir. 2010.) However, the ALJ need not mention every piece of evidence so long as he builds an accurate and logical bridge from the evidence to his conclusion. *Id.* In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995.)

SSR 16-3p requires the ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029, at *7. The Court will only reverse the ALJ's credibility finding if it is "patently wrong." *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ's credibility determination is patently wrong if it lacks "any explanation or support." *Elder*, 529 F.3d at 413–14.

Claimant's earlier appeal to this Court was remanded to the Social Security Administration because of a flawed credibility determination. (R. 576-79.) The current subjective symptom evaluation also has troubling flaws. First, the ALJ relied heavily on what he perceived as a sparse treatment history as evidence that Claimant's pain was not as severe as alleged during the relevant period. (R. 492–96.) The Administration's policies do acknowledge that a claimant's failure to pursue or comply with treatment for

a condition can suggest that symptoms may not be severe. See SSR 16-3p, 2016 WL 1119029, at *8-9; SSR 96-7p, 1996 WL 374186, at *7-8. An ALJ, however, may not draw such a conclusion without first considering any alternate explanations for the lack of treatment. *See* SSR 16-3p, 2016 WL 1119029, at *8 (instructing ALJs to consider "possible reasons [a claimant] may not comply with treatment or seek treatment consistent with the degree of his or her complaints.").

The ALJ placed a great deal of emphasis on Claimant's delay in undergoing spinal fusion surgery. (R. 496, "The fact that it took years for the recommended surgery to be completed, does not convince me that…the level of pain complained of is supported.") The ALJ's reasoning ignored or gave short shrift to Claimant's explicitly stated reasons for postponing spinal fusion surgery. Claimant underwent two back surgeries in 2008 and gave several reasons why she was reluctant to pursue a third, more serious, surgery despite her ongoing pain. At her first hearing, Claimant stated that her surgeon had warned of a difficult recovery, that she had seen an uncle go through a similar surgery, and that she was "point blank…afraid to have it done." (R. 42–43.) The record confirms that Dr. Schafer did warn her of a high risk of second post-surgical infection. (R. 398.) As late as 2013, records indicate that she hoped to find "less invasive" a treatment option with a "short recovery" period, and had looked into laser back surgery. (R. 829, 832, 835.) Surgery may have been further delayed due to insurance barriers. (R. 821.) At her second hearing, her attorney referenced Claimant's fears and her financial difficulties as the reasons she postponed spinal fusion. (R. 542–43.)

The ALJ failed to address those reasons and instead focused on Claimant's lack of recorded attempts to quit smoking. Despite her surgeon's directive that she would need to quit for two months to qualify for spinal fusion surgery, Claimant made no noted efforts to quit smoking during the relevant period. The ALJ took the lack of cessation attempts as evidence that her pain at that time may not have been severe enough to warrant surgery. But such an inference does not hold if Claimant avidly wished to avoid spinal fusion surgery because she greatly feared its difficult recovery period and other potential negative outcomes. It would make little sense to expect a person with a smoking habit to attempt smoking cessation solely to qualify for a surgery she did not want. *See Shramek v. Apfel,* 226 F.3d 809, 813 (7th Cir. 2000) ("Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effects of smoking on a person's health."). The ALJ was permitted to consider Claimant's delay in getting spinal fusion surgery, which finally occurred more than five years after the close of her insured period, in evaluating her pain assertions. However, it was not appropriate for him to do so without also evaluating Claimant's stated reasons for the delay.

Similarly, the ALJ faulted Claimant for having very little physical therapy. The record, however, is clear that physical therapy provided no relief for her pain. (R. 43, 583–85.) It was not unreasonable, or reliably indicative of a lack of pain, for Claimant to discontinue a course of treatment that had been unsuccessful.

The ALJ's analysis of the voluminous medical record also focused heavily on occasional notations indicating that her pain was "controlled" or managed by medications. This note occurred after medication changes, during periods when she

reported pain scores of seven-to-ten out of ten or acknowledged feeling stressed from her "constant pain." (R. 411, 413, 829–32.) It would be reasonable to assume that the "control" achieved by her pain medications was limited. The ALJ, however, concluded from those same notes that "nothing supports her assertions of debilitating pain." (R. 493.) This is impermissible cherry-picking and also mandates remand. *Goble,* 385 Fed. Appx. at 593.

### B.    RFC Analysis

In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir. 2009.) Claimant argues that the ALJ did not support his finding that she can perform sedentary work because he did not provide a "function-by-function" assessment of her tolerances for sitting, standing, lifting, and the like. (Dkt. 31 at 5–6.) She also argues that the ALJ's narrative method of reviewing and drawing conclusions from the evidence was flawed. (*Id.* at 6–7.)

The Court notes that, "[a]lthough the RFC assessment is a function-by-function assessment, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 F. Appx. 652, 657 (7th Cir. 2009) (internal quotations and ellipses omitted). However, in that narrative discussion, an ALJ must consider all relevant evidence and may not omit entire lines of evidence that support a finding of disability. *Goble,* 385 Fed. Appx. at 593.

Here, the ALJ pointed to Claimant's activities of daily living to determine that she spends the majority of her day sitting. In addition, the ALJ found that her medical

records supported a finding that, during the relevant period, she was able to stand and walk effectively.  (R. 495.)  He relied on those facts to support his conclusion that she could perform sedentary work, which entails spending most of the work day sitting, but may entail up to two hours of standing and walking in the work day.  However, the ALJ did not address the repeated contentions in the record that Claimant's sitting took place mostly in a recliner with her legs elevated and that she was unable to sit comfortably in a regular chair for extended periods of time.  Claimant reported these exact issues to the Administration and to her doctor in 2009 and 2010, dates relevant to this claim.  (R. 194, 213-24, 360.)

Additionally, the ALJ has provided an incomplete characterization of the medical record with respect to Claimant's ability to walk.  Records from the time of her first emergency room visit in 2008 through at least October 2009 indicate that she was having some difficulty walking through much of the relevant period.  (R. 285, 360–70.)  While the VE testimony did address the need to change from a sitting to a standing position, the RFC contains no limitations in walking and no mention of a need to elevate the legs.  Accordingly, the ALJ failed to "build an accurate and logical bridge" from the evidence of Claimant's daily activities in her recliner to his finding that she could sit, with no need for leg elevation, for six hours of an eight-hour workday and stand or walk for two hours.  *Clifford*, 227 F.3d at 872.  Because the ALJ did not address significant contrary lines of evidence when crafting that RFC, the ALJ did not provide substantial evidence to support his finding that Claimant's medical record and reported daily activities demonstrated an ability to perform sedentary work.

### 3.    Vocational Expert Testimony

At step five in the sequential evaluation, the burden shifts from the claimant to the Commissioner, who must demonstrate that, given the claimant's limitations, there are still jobs existing in significant numbers in the national economy that she can perform. An ALJ has the discretion to employ a vocational expert to testify about the types of occupations that can be performed by a person of the claimant's limitations, and about the availability of jobs in those occupations. *Weatherbee v. Astrue,* 649 F.3d 565, 569 (7th Cir. 2011).

The Court is remanding this matter in order to address the above-described flaws in the ALJ's subjective symptom evaluation and RFC assessment. Because the outcome of that re-evaluation may be a different RFC assessment, the Court need not now address Claimant's arguments about the VE's hearing testimony.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [30] is granted, the Commissioner's Motion for Summary Judgment [38] is denied, and the decision of the ALJ is remanded to the Social Security Administration for proceedings consistent with this Opinion.

ENTERED:

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: July 25, 2017**